THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DUNMORE SCHOOL DISTRICT,           :
                                    : CIVIL ACTION NO. 3:20-CV-1091
            Plaintiff,              : (JUDGE MARIANI)
                                    :
      v.                            :
                                    :
PENNSYLVANIA INTERSCHOLASTIC       :
ATHLETIC ASSOCIATION,               :
                                    :
            Defendant.              :

<u>MEMORANDUM OPINION</u>
I. Introduction

Here the Court considers Plaintiff's Motion for Preliminary Injunction (Doc. 15) filed

on November 3, 2020, with which Plaintiff Dunmore School District ("Dunmore" "Plaintiff")

seeks a preliminary injunction enjoining Defendant Pennsylvania Interscholastic Athletic

Association ("PIAA" "Defendant") from reclassifying Dunmore School District from Class 3A

to Class 4A for the sport of girls' basketball for the 2020-2022 two-year period.  (Doc. 15 at

1.)  In the underlying action, Plaintiff asserts that the reclassification violated "plaintiff's

constitutional rights to due process and equal protection of the laws, and in further violation

of the spirit, purpose, and plain language of the defendant's rules, regulations, policies,

Constitutions, and By-Laws."  (Doc. 1 at 9 (Compl. at 1).)  The Court held a hearing on

November 13, 2020, at which both parties presented witnesses and oral argument.  The

parties also agreed upon a post-hearing briefing schedule and their briefs have now been

filed.  (Docs. 25, 26.)  For the reasons that follow, the Court will deny Plaintiff's motion.

## II. Background

### A. Factual Background

Plaintiff, Dunmore School District ("Dunmore"), is a school district encompassing approximately nine square miles which serves the Borough of Dunmore in Lackawanna County, Pennsylvania, and funds the Dunmore High School girls' basketball program. (Doc. 16 at 4.)

According to the PIAA, it is a

Pennsylvania nonprofit voluntary membership corporation comprised of most Pennsylvania public and private high schools, with the purpose and function of developing and enforcing rules regulating interscholastic athletic competition among and between its member schools. PIAA's membership consists of approximately 1,435 high schools and junior highs/middle schools that have joined PIAA. Annually, approximately 350,000 students participate in PIAA competition.

PIAA is governed by a Constitution adopted and amended by its member schools, and by rules and regulations adopted and amended by its Board of Directors. For administrative purposes, PIAA is divided into twelve geographic Districts. This matter arises out of PIAA District II, which encompasses Lackawanna, Luzerne, Pike, Susquehanna, Wayne and Wyoming Counties.

(Doc. 18 at 8.)

Traditionally, PIAA classified teams based only on school enrollment numbers. (*Id.* at 8-9.) However, because PIAA faced criticism about competitive imbalance among similarly sized schools, PIAA formed a Competition Committee in 2017, and the Committee developed the Competition Classification Formula ("CCF") at issue in this case. (Doc. 18 at 9.) According to the PIAA, in formulating the CCF, the Competition Committee

recommended "adding a 'success factor' in classifying teams, particularly when success is

supported by transfer students." (*Id.*)   The formula was unanimously adopted at the PIAA

Board of Directors' July 2018 meeting.  (*Id.*)

> The CCF currently provides as follows:
>
> A school's competition classification will be determined by sport and gender using the following formula.  All three items will be combined to determine the competition classification.
> **Enrollment classification + Success factor + Athletic transfers = Competition Classification**
>
> #1 – Enrollment classification
> All schools will be classified by enrollment of grades 9-10-11 in the odd numbered calendar years by sport and by gender.  This is standard procedure.
>
> #2 – Success factor
> All schools will have their success in post-regular season rated by the following scale.
> 1 point for participation in an entry level inter-district championship contest.
> 2 points for participation in a quarter-final inter-district contest.
> 3 points for participation in a semi-final inter-district contest.
> 4 points for points [sic] for participation in a final inter-district contest.
>
>> A.   In the previous two year cycle, schools will receive points upon their highest finish in post-season.  If a school's team achieves 6 points or greater, the school may move up 1 classification for the next classification cycle in that sport and gender based upon the number of transfers the school received under the transfer formula.
>>
>> B.   If a school that participates in a higher enrollment classification obtains 3, 4, or 5 success points cumulative in the two year cycle, the school will remain in that higher enrollment classification for the next two year cycle.

#3 – Athletic Transfers

Schools may receive transfer students without affecting their classification if the student enters their new school during the traditional natural break (8th grade to 9th grade).  Any sport specific transfer <u>after the natural break transfer</u> will subject the student to a possible post-season ban for one year if the transfer is after being eligible to participate of [sic] a 10th grade season and based upon the district committee or regional panel determination of eligibility.

    A.    In the previous two year classification cycle, if a school receives 6 points in the previous classification cycle and accepts transfer students by sport and gender the school [sic] and equals or exceeds the stated number, they will move up 1 classification.
Example:    (1) transfers in basketball = up 1 classification
    (3) transfers in football = up 1 classification

    B.    If a school accumulates 6 points or greater in the previous cycle **and does not receive transfer students**, it will remain in their same enrollment classification for the next two year cycle.

    C.    A school that has moved up in class does not obtain 3, 4, or 5 success points in a cycle, but **has transfer students** equal to or exceeds the number by sport will remain up in that classification for the next two year cycle.

(Pl.'s PI Hr'g Ex. 1 (emphasis in original).)

Defendant explains the application of the CCF as follows:

PIAA classifies teams in two-year cycles. The next cycle after the July 2018 meeting was to begin in the 2020-2021 school year. Under the new formula, PIAA would consider team success in the 2018-2019 and 2019-2020 seasons in setting classifications, with each team receiving points for success at each level of the PIAA championship tournament.  PIAA would also consider transfer students, without considering the intent of the transfer. If "success" in basketball generated 6 points and one transfer, it would move up a classification.[1]

---

[1]  The PIAA notes that, after originally promulgated, the formula changed as to the number of basketball transfers:

(Doc. 18 at 9-10.)

The Dunmore School District's high school girls' basketball team was in the PIAA's 3A classification during the 2018-2020 cycle.  Due to the application of the CCF in the spring of 2020, the PIAA assigned the girls' basketball team to the 4A classification.  (Doc. 16 at 5; Doc. 18 at 10.)   Plaintiff provides the following summary of the CCF application:

> At the conclusion of the 2019-2020 girls' basketball season, PIAA applied its Competition Classification Formula, and assigned Dunmore eight (8) total points under the Formula for the two-year cycle comprised of the 2018-2019 and 2019-2020 seasons. PIAA assigned Dunmore six (6) success factor points and concluded that Dunmore accepted two (2) transfers under the Formula. Because of this point total, PIAA reclassified Dunmore girls' basketball from Class 3A to Class 4A.

(Doc. 16 at 5.)

Plaintiff appealed the reclassification, asserting the CCF was improperly applied: success points were improperly calculated because two points should not have been assessed for participation in the quarter-finals when Dunmore did not play in the 2020 post-season quarter-finals due to the COVID pandemic-based shutdown; and the two students counted as transfers, O.L. and E.C., should not have been counted as Athletic Transfers in

---

The rule originally provided that 2 transfers were needed to move up. However, following additional input from member schools, and considering the impact that a single transfer could have on a basketball team, the Board reduced the qualifying number to 1, passing the proposal on three separate readings (May 22, 2019, July 17, 2019 and October 2, 2019). Between each reading, all member schools were advised of the proposed change. Not only did Dunmore not express objection to the proposal, its high school's principal was on the District II Committee and never expressed opposition to the change.

(Doc. 18 at 10 n.1.)

applying the formula because neither student transferred with athletic purpose.  (Doc. 16 at

6, 8, 9.)  By correspondence of May 11, 2020, the PIAA Executive Director denied the

appeal, "confirming that the team had earned 6 points for reaching the finals in 2019 and 2

points for reaching the quarterfinals in 2020 and because it had two transfer students on the

team."  (Doc. 18 at 10.)  Dunmore appealed the decision, and, after hearing the appeal on

May 20, 2020, the PIAA Board of Directors voted to sustain the Executive Director's

decision.[2]  (Doc. 18 at 10-11.)

After exhausting the PIAA's administrative appeals process (*id.* at 9-11), Plaintiff filed

suit in the Court of Common Pleas of Lackawanna County.

## B.  Procedural Background

Plaintiff filed the underlying action in the Court of Common Pleas of Lackawanna

County on June 19, 2020.  (Doc. 1 at 9.)  On June 23, 2020, Plaintiff filed Plaintiff's Petition

for Preliminary Injunction in the Court of Common Pleas of Lackawanna County.  (Doc. 1 at

98-102.)   Defendant filed the Notice of Removal on June 29, 2020 (Doc. 1), and Plaintiff

filed a Motion to Remand on July 14, 2020 (Doc. 4).  The Court denied Plaintiff's Motion to

Remand (Doc. 4) by Memorandum and Order of October 27, 2020.  (Docs. 8, 9.)  Having

been directed to notify the Court within three days if Plaintiff intended to pursue preliminary

---

[2] The appeal was conducted via Zoom teleconference.  (Doc. 18 at 11.)  Dunmore was represented by its solicitor and presented evidence from its principal, girls' basketball head coach, a student, and the student's mother.  (*Id.*)  The Board voted to deny Dunmore's appeal by a vote of 23-6 with 1 abstention. (*Id.* at 13.)

injunctive relief (Doc. 9), Plaintiff's counsel did so on the same date as the Order was issued, and this Court set a telephonic conference for October 29th (Docs. 10, 11).

At the October 29th conference, the Preliminary Injunction Hearing ("PI Hearing") was set for November 13, 2020, by the express agreement of the parties. Counsel for the parties also established an expedited pre-hearing briefing schedule. Plaintiff filed the Motion for Preliminary Injunction on November 3, 2020, with a supporting brief. (Docs. 15, 16.) Defendant filed its opposition brief on November 10, 2020. (Doc. 18.)

Plaintiff filed a motion to continue the hearing on November 12, 2020 (Doc. 19), and Defendant filed an opposition brief on November 12, 2020 (Doc. 20). Plaintiff's motion to continue the hearing was denied by Order of November 12, 2020. (Doc. 21.)

The Court conducted the PI Hearing on November 13, 2020. Plaintiff presented four witnesses: Kimberly Conte and Jaysa Lynwood, parents of the transfer students; Timothy Hopkins, Dunmore Junior-Senior High School Principal; and Benjamin O'Brien, the coach of the girls' basketball team. Defendant presented one witness, Robert Lombardi, Executive Director of the PIAA. Counsel for both parties presented oral argument.

The parties have now filed their agreed-upon post-hearing briefs: Plaintiff timely filed its Reply Brief (Docs. 25) on November 20, 2020; Defendant timely filed its Sur-Reply Brief (Doc. 26) on November 30, 2020. Therefore, this matter is ripe for disposition.

III. LEGAL STANDARDS

A.  <u>Preliminary Injunction</u>

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.

Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited

circumstances.  The test for preliminary relief is a familiar one. A party seeking a preliminary

injunction must show:

(1) a likelihood of success on the merits;

(2) that it will suffer irreparable harm if the injunction is denied;

(3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and

(4) that the public interest favors such relief.

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citations omitted).

In *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017), the Circuit Court referred

to the first two factors as "gateway factors," explaining that

a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Reilly*, 858 F.3d at 179.

B. <u>Mandatory Injunction</u>

The Third Circuit Court of Appeals recently stated in *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020), that a party seeking a mandatory injunction bears a "particularly heavy" burden, requiring the party to show a substantial likelihood of success on the merits and that their right to relief is indisputably clear.  A mandatory injunction has been defined as follows:

> "An injunction is mandatory if the injunction will either (1) 'alter the status quo by commanding some positive act' or (2) provide the moving party with 'substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33–34 (2d Cir. 1995), *aff'd*, 931 F.3d 215 (3d Cir. 2019). "[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction," as mandatory injunctions are generally disfavored. *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

*Pub. Interest Legal Found. v. Boockvar*, No. 1:20-CV-1905, 2020 WL 6144618, at *2 (M.D. Pa. Oct. 20, 2020).

## IV. ANALYSIS

In support of the injunction sought, Plaintiff generally states that "PIAA's interpretation and application of the CCF were arbitrary, irrational, violative of Dunmore's constitutional rights of due process and equal protection, and contrary to PIAA's rules, regulations, policies, Constitution, and By-Laws."  (Doc. 14 ¶ 5.)  More specifically, Plaintiff identifies three bases for the claimed relief: 1) Dunmore faces arbitrary and capricious discrimination because, in calculating the Competition Classification Formula, PIAA

assigned Dunmore two points for participation in a post-season game that was never played (Doc. 16 at 22); 2) Dunmore faces arbitrary and capricious discrimination because PIAA wrongfully classified the two students counted as "transfer students" (O.L. and E.C.) under the Competition Classification Formula (Doc. 16 at 22); and 3) PIAA's modification of the athletic transfer provision of the Competition Classification Formula during the two-year cycle was arbitrary and irrational in violation of Plaintiff's due process rights (Doc. 16 at 18).

A. Likelihood of Success on the Merits

As noted above, a showing of the likelihood of success on the merits is a "gateway factor" which the plaintiff must establish with the required specificity. *Reilly*, 858 F.3d at 179. The standard for meeting the threshold showing for this factor depends on whether the relief sought renders the injunction a "mandatory injunction." Ordinarily a movant for preliminary equitable relief must demonstrate that it can win on the merits "which requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* If the movant seeks a mandatory injunction, the party bears a "particularly heavy burden . . . requiring [the party] to show a substantial likelihood of success on the merits and that their right to relief is indisputably clear." *Hope*, 972 F.3d at 320 (internal citation and quotation marks omitted).

The parties dispute which standard the Court should apply in this case.[3]  However, at this juncture, the Court need not decide which standard applies, proceeding on the basis that Plaintiff must satisfy at least the minimum standard identified in *Reilly*, 858 F.3d at 179. Thus, consideration of the likelihood of Plaintiff's success on the merits requires the Court to ascertain whether Plaintiff has shown, at a minimum, that it is "significantly better than negligible but not necessarily more likely than not" that Plaintiff will prevail on its claimed violations of the Fourteenth Amendment's Equal Protection Clause, Fourteenth Amendment's Due Process Clause, or state law claim grounded in alleged arbitrary and capricious decision making by the PIAA.  *Id.*

Plaintiff's reply brief addresses only the likelihood of success on the merits of its state law claim stating that "Dunmore has shown likelihood of success on the merits on its state law claim of PIAA's arbitrary and capricious discrimination, regardless of its likelihood of success on its federal claims." (Doc. 25 at 2.)  Despite limiting its argument, Plaintiff does not definitively abandon its federal constitutional claims.  Therefore, the Court will address all claimed bases for relief identified in Plaintiff's Complaint, Plaintiff's Motion for Preliminary Injunction, and the Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, i.e., Fourteenth Amendment Due Process Clause and Equal Protection Clause

---

[3] At the PI Hearing, Defendant argued that Plaintiff is seeking a mandatory injunction pursuant to *Hope* because the relief sought by Plaintiff will alter the status quo in that PIAA has already reclassified Dunmore as 4A and, therefore, Dunmore is asking the Court to undo an act, not merely preserve the status quo.  (Doc. 27 at 74 (Hr'g Tr. 74:15-23).)  Plaintiff argued that it does not seek a mandatory injunction because it seeks the injunction to maintain the status quo which is its 3A classification.  (*Id.* at 78-79 (Hr'g Tr. 78:6-79:6).)

claims, and state law claim of arbitrary and capricious discrimination.  (*See* Docs. 1, 15, 16.)
The Court will first address Plaintiff's constitutional claims as they are the basis of this
Court's jurisdiction of the above-captioned matter.

## 1.  Federal Claims

Neither Plaintiff's written submissions nor PI Hearing presentation clearly articulate
the basis for its claimed right to relief on due process or equal protection grounds.
However, the Court will proceed with the analysis of these constitutional claims based on
the broad arguments/assertions contained in Plaintiff's Complaint (Doc. 1 at 9-30), Plaintiff's
Motion for Preliminary Injunction (Doc. 15), the Memorandum in Support of Plaintiff's Motion
for Preliminary Injunction (Doc. 16), and put forth at the PI Hearing (Doc. 27).

Plaintiff's claimed constitutional deprivations are brought under 42 U.S.C. § 1983
which states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C.A. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that "(1)
... the conduct complained of was committed by a person acting under color of state law and
(2) ... [that] the conduct deprived the complainant of rights secured under the Constitution or
federal law." *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d Cir.1988).

The parties do not dispute that the PIAA is a state actor for purposes of a § 1983 action.  PIAA has been determined to be a state actor "in the constitutional sense."  *School District of Harrisburg v. Pennsylvania Interscholastic Athletic Ass'n*, 309 A.2d 353, 357 (Pa. 1973); *Louisiana High School Athletic Association v. St. Augustine High School*, 396 F.2d 224, 227 (5th Cir. 1968) ("There can be no substantial doubt that conduct of the affairs of (a statewide athletic association) is state action in the constitutional sense.  The evidence is more than adequate to support the conclusion . . . that the Association amounts to an agency and instrumentality of the State.")  However, the parties do not address whether Plaintiff is a "person" allowed to bring a § 1983 claim against a state actor in the context presented here.  This is a not a question which can be definitively answered without considering the relationship between the parties.  *See, e.g., Pocono Mountain Charter School v. Pocono Mountain School District*, 442 F. App'x 681, 687 (3d Cir. 2011) (not precedential); *School District of Philadelphia v. Pennsylvania Milk Marketing Board*, 877 F. Supp. 245, 250-51 (E.D. Pa. 1991).  However, for purposes of the pending motion only, the Court will assume *arguendo* that Dunmore School District has standing to assert 42 U.S.C. § 1983 claims.[4]  Thus, the question is whether Defendant's reclassification of Dunmore girls'

---

[4] In its Answer with Affirmative Defenses, Defendant asserts that "Plaintiff is not a member of PIAA, is not governed by the PIAA Competition Classification Formula and lacks standing to pursue the claims of others."  (Doc. 3 ¶ 74.)  In the course of direct questioning at the PI Hearing, the issue of standing arose only in response to Defendant's counsel's objection to a question Mr. Hopkins was asked about Dunmore Junior-Senior High School's membership in the PIAA.  (Doc. 27 at 26-27 (Hr'g Tr. 26:22-27:23).)  Plaintiff's counsel referenced the assertion in the Answer about Plaintiff's standing, and Defendant's counsel stated that, with her objection (which was articulated to be based on "the leading nature of the questions"), she

basketball team from 3A to 4A violated Plaintiff's Equal Protection or Due Process rights

secured under the United States Constitution.

*a. Due Process*

In many filings, Plaintiff states generally that its due process rights were violated by

the PIAA.   (Doc. 1 (Compl. ¶¶ 45, 46); Doc. 15 ¶ 5; Doc. 16 at 19, 21, 22, 24, 25.)

The Fourteenth Amendment provides that no person shall be deprived "of life, liberty,

or property, without due process of law." U.S. Const. amend. XIV, § 1. "While on its face

this constitutional provision speaks to the adequacy of state procedures, the Supreme Court

has held that the clause also has a substantive component."  *Nicholas v. Pennsylvania*

*State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (citing *Planned Parenthood of S.E.*

*Pennsylvania v. Casey,* 505 U.S. 833, 846–47 (1992) ("it is settled that the due process

clause of the Fourteenth Amendment applies to matters of substantive law as well as to

matters of procedure").

The Supreme Court has explained the distinction between the two as follows:

> We have emphasized time and again that "[t]he touchstone of
> due process is protection of the individual against arbitrary action
> of government," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S. Ct.
> 2963, 2976, 41 L.Ed. 2d 935 (1974), whether the fault lies in a
> denial of fundamental procedural fairness, *see, e.g., Fuentes v.*
> *Shevin*, 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed. 2d 556
> (1972) (the procedural due process guarantee protects against
> "arbitrary takings"), or in the exercise of power without any

---

was "not saying anything about standing, . . . I'm just asking about the nature of the way questions are
being asked."  (Doc. 27 at 27 (Hr'g Tr. 27:9-10, 15-19, 21-23).)

> reasonable justification in the service of a legitimate governmental objective, *see, e.g., Daniels v. Williams*, 474 U.S. [327,] 331, 106 S.Ct. [662,] 664[, 88 L.Ed.2d 662 (1986) (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).

Plaintiff does not indicate whether its claims are based on procedural or substantive due process violations. Thus, the Court will assess Plaintiff's likelihood of success under each component of the Due Process Clause.

### i.  Procedural Due Process

As set out above, the Fourteenth Amendment's prohibition against state deprivation of "life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, "places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause," *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 9 (1978). "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). "As such, the focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." *K.S.S. v. Montgomery Cty. Bd. of Comm'rs*, 871 F. Supp. 2d 389, 397-98 (E.D. Pa. 2012). "Due

Process is flexible and calls for such procedural protection as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 324 (1976).

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (internal citation and quotation marks omitted). Thus, "[a] procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute due process of law." *Schmidt v. Creedon,* 639 F.3d 587, 595 (3d Cir.2011) (internal citation and quotation marks omitted). "It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." *Mudric v. Attorney Gen. of U.S.,* 469 F.3d 94, 98 (3d Cir.2006).

In considering a procedural due process claim, the threshold question is whether a plaintiff has identified a protected property interest. "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972). "State law does not define the parameters of due process for the purposes of the Fourteenth

Amendment. Rather, federal law defines those parameters." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.,* 587 F.3d 176, 195 (3d Cir.2009) (internal citation omitted). The Supreme Court has stated that "a mere unilateral expectation ... is not a property interest entitled to protection." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980); *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 154 (3d Cir. 2018).

Here, Plaintiff has not alleged how Defendant deprived it of any procedural due process rights. On the threshold question of a protected property interest, Plaintiff acknowledges in its reply brief that the Pennsylvania Commonwealth Court specifically stated in *Boyle* that "'PIAA is correct in its contention that [the student plaintiff] does not have a property interest in playing interscholastic sports.'" (Doc. 25 at 4 (quoting *Boyle*, 676 A.2d at 700).) At the PI Hearing, the Court questioned Plaintiff's counsel about how Plaintiff's position squared with the conclusion in *Pennsylvania Interscholastic Athletic Association, Inc. v. Greater Johnstown School District*, 463, A.2d 1198 (Pa. Commw. Ct. 1983), that "[t]he trial judge properly concluded that there is no property right to participate in athletics." (Doc. 27 at 80 (Hr'g Tr. 80:9-13).) Plaintiff's Counsel sought to distinguish the single student at issue in *Johnstown* with this case which he said "is about an entire school district, an entire team, and the determination of an enrollment classification." (*Id.* (Hr'g Tr. 20-24).) Defendant's counsel responded that this was "a distinction without a difference . . . [b]ecause the general principal is that there is no right to participate in interscholastic

athletics." (Doc. 27 at 80-81 (Hr'g Tr. 1-5).)   After follow-up questioning and analysis, the Court concluded that Plaintiff had made no showing of a constitutionally-recognized property interest to which due process rights appertain and the Court's research had found to such interest.  (Doc. 27 at 85-86 (Hr'g Tr. 85:6-86:11).)

Based on the determination at the PI Hearing that Plaintiff had not identified a cognizable property interest and the fact that Plaintiff presented no further argument on the issue in its reply brief (Doc. 25), the Court concludes that success on the merits of a Fourteenth Amendment Procedural Due Process claim is unlikely because Plaintiff has not shown that its chance of success is "significantly better than negligible," *Reilly*, 858 F.3d at 179, on its Fourteenth Amendment procedural due process claim.[5]

## ii. Substantive Due Process

In *Nicholas v. Pennsylvania State University*, the Court of Appeals for the Third Circuit addressed the substantive component of the Due Process Clause at length, beginning with the observation that "this Court has previously observed [that] substantive due process 'is an area of law famous for controversy, and not known for its simplicity.'" 227 F.3d at 139 (quoting *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir. 1995)).  *Nicholas* added that "[p]art of this conceptual confusion may arise from the fact that

---

[5] Even if a protected interest were identified, Plaintiff does not indicate how it was deprived of process due.  Plaintiff has not alleged that it was impaired or prevented from voicing its complaints. In fact, the record reflects that it did so and Defendant provided a response and explanation for its disagreement with Plaintiff's position.

the fabric of substantive due process, as woven by our courts, encompasses at least two very different threads." *Id.* The Circuit Court then explained the difference between the two threads: "[t]he first thread of substantive due process applies when a plaintiff challenges the validity of a *legislative* act . . .  [and] [t]he second thread . . . protects against certain types of *non-legislative* state action." *Id.* Noting that the distinction between legislative acts and non-legislative or executive acts is crucial, *Nicholas* explained the difference as follows: "executive acts, such as employment decisions, typically apply to one person or to a limited number of persons, while legislative acts, generally laws and broad executive regulations, apply to large segments of society.'" 227 F.3d at 139 n.1 (internal citation and quotation marks omitted).

Here the Court will analyze the PIAA complained of under the second thread, i.e., as a non-legislative act.

> [A] non-legislative government deprivation that comports with procedural due process may still give rise to a substantive due process claim upon allegations that the government deliberately and arbitrarily abused its power. . . . [A] property interest that falls within the ambit of substantive due process may not be taken away by the state for reasons that are arbitrary, irrational, or tainted by improper motive, . . . or by means of government conduct so egregious that it shocks the conscience. . . .
>
> To prevail on a non-legislative substantive due process claim, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies. . . . However, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process. Rather, to state a substantive due process claim, a plaintiff must have been deprived of a *particular quality* of property interest

227 F.3d at 139-40 (internal citation and internal quotation marks omitted).  While the contours of what type of property interest is protected are uncertain, *Nicholas* stated that the "guiding principle" is whether the interest is "fundamental" under the United States Constitution.  *Id.* at 140.

The Court need not further delve into what precisely constitutes a protected substantive due process property interest in that the applicable legal framework clearly indicates that an asserted violation of Plaintiff's substantive due process rights would fail for the same reason that its procedural due process claim would fail.  Here Plaintiff complains of non-legislative action and to prevail on a non-legislative substantive due process claim, "a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies."  *Nicholas*, 227 F.3d at 139-40.  As discussed above, Plaintiff has not identified, and the Court's own research has not found, a protected property interest in the school district's PIAA classification. Therefore, like Plaintiff's procedural due process claim, Plaintiff has not shown that its chance of success is "significantly better than negligible," *Reilly*, 858 F.3d at 179, on its Fourteenth Amendment substantive due process claim

### b.  Equal Protection

As with its Due Process Clause claims, Plaintiff does not clearly articulate the basis for its claimed violation of the Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. amend. XIV, § 1; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Ordinarily, a plaintiff must allege that: (1) he or she was a member of a protected class, (2) he or she was treated differently from similarly situated persons outside of his or her protected class, and (3) the resultant discrimination was purposeful or intentional rather than incidental.  *Tillman v. Lebanon County Corr. Fac.*, 221 F.3d 410, 423-24 (3d Cir. 2000).  Once intentional disparity in treatment is shown, a court will proceed to determine whether the disparity can be justified under the requisite level of scrutiny.  *See City of Cleburne*, 473 U.S. at 439–40; *Plyler v. Doe,* 457 U.S. at 216–17.

In evaluating an equal protection claim, a court must determine the appropriate standard to be applied, specifically strict scrutiny, intermediate scrutiny, or rational basis.  *Doe v. Pennsylvania Bd. of Probation and Parole,* 513 F.3d 95, 107 (3rd Cir.2007). If the challenged action involves a "suspect" class based upon race, alienage, or national origin, or infringes on a fundamental constitutional right, the strict scrutiny standard applies.  *Donatelli v. Mitchell,* 2 F.3d 508, 513 (3rd Cir.1993).  Under the strict scrutiny standard, the action will be sustained only if narrowly tailored to serve a compelling state interest.  *City of Cleburne,* 473 U.S. at 440.  "Intermediate scrutiny (applicable to quasi-

suspect classes like gender and illegitimacy) requires that a classification 'be substantially related to an important governmental objective.'" *Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (quoting *Clark v. Jeter,* 486 U.S. 456, 461 (1988)).  If the state action does not burden a fundamental right or target a suspect class or quasi-suspect class, the challenged classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" or different treatment.  *Donatelli,* 2 F.3d at 513; *Newark Cab Ass'n,* 901 F.3d at 156.  Rational basis review is a very deferential standard which "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313 (1993).

In addition to a claim based on membership in an identified class, an equal protection claim can also be brought by a "class of one" where a plaintiff alleges that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Williams v. Morton*, 343 F.3d 212, 221 (2003); *Phillips v. County of* Allegheny, 515 F.3d 224, 243 (3d Cir. 2008).

Courts have consistently found that there is no constitutional right to participate in interscholastic athletic programs. *See Angstadt v. Midd–West Sch. Dist.,* 377 F.3d 338 (3rd Cir.2004).  In considering the plaintiff's equal protection claim in *Boyle*, the Commonwealth Court of Pennsylvania stated that

> PIAA's rules and regulations must be viewed under the "rational basis"
> standard [ ] since [the plaintiff] is not the member of a suspect class nor is a
> fundamental right involved. *See Snider v. Thornburgh,* 496 Pa. 159, 436 A.2d
> 593 (1981). Under this standard, there is a presumption that PIAA's rules and
> regulations are valid. *See United States Steel Corp. v. Workmen's
> Compensation Appeal Board (Mehalovich),* 72 Pa.Cmwlth. 481, 457 A.2d 155
> (1983). Furthermore, PIAA's rules and regulations, both on their face as well
> as in their application, "must be sustained [under the equal protection clause]
> unless [they are] patently arbitrary and bear[ ] no rational relationship to a
> legitimate governmental interest." *Id.* 457 A.2d at 157.

*Boyle,* 676 A.2d at 702.  In *Dziewa v. Pennsylvania Interscholastic Athletic Ass'n, Inc.,* Civ.

A. No. 08-5792, 2009 WL 113419 (E.D. Pa. Jan. 16, 2009), the court also found that "the

rational basis standard applies to the classification that Plaintiffs allege the PIAA created."

*Id.* at *5.

Here Plaintiff has not alleged the basis for its equal protection claim.  (*See, e.g.,* Doc.

1 at 21 (Compl. ¶¶ 45, 46); Doc. 15 ¶ 5.)  In Plaintiff's counsel's May 15, 2020,

correspondence to the PIAA Board of Directors, he states that he "believe[s] that the

Competition Classification Formula violates my client's right to equal protection under the

Constitution." (Doc. 15 at 51.)  The Court does not find a class or classification identified

anywhere in Plaintiff's filings.  Nor does Plaintiff explicitly state that its claim is based on a

class-of-one theory.

At the PI Hearing, Plaintiff's counsel was asked regarding its equal protection claim

"how Dunmore had been treated differently from the entire membership of the PIAA." (Doc.

27 at 86 (Hr'g Tr. 86:20-22).)  He responded as follows:

from the classification formula, we were penalized with two transfer students, and we didn't have two transfer students, we established the fact that we did not have two transfer students, and the arbitrary part is October 1 of 2019, they enacted, drop it to one transfer student, and then they try and apply it retroactively.  We had no transfer students after October 1 of 2019.

It's unfair in the way we were treated in that situation and different from anybody else because we didn't have those transfer students, and we appealed that . . .

(Doc. 27 at 87 (Hr'g Tr. 87:9-18).)

Defendant's counsel asserted that there was a rational basis for what was done:

Our basis is that we were faced with uneven competition throughout the Commonwealth.  In 2017, the Competition Committee started to look at this. There was a lot of input, there was a lot of discussion, and the formula . . . they came up with . . . measured not just the success, but they also had to deal with transfers between schools, and they decided . . . to not apply the athletic – or the intent to the Athletic Transfer Rule, because if you transfer with athletic intent, like, I don't like this school because we're not doing well, but this is a state powerhouse, I want to play there, I want the scouts to see me.  This kind of thing happens.

PIAA decided not to do that, because if you are determined to have transferred with athletic intent, you must sit out for an entire year.   In this situation, we are not making kids sit out.  Play.  We're not going to get into whether or not you intended or the reason for your transfer was athletically-motivated.

(Doc. 27 at 87-88 (Hr'g Tr. 87:25-88:16).)

After further discussion, the Court noted that "the evidence appears to be that, no matter how much you don't like what happened, it happened to every school district.  They are all subject to the same application." (Doc. 27 at 89 (Hr'g Tr. 21-23).)  As to the question

of whether the CCF had a greater impact on Dunmore or was intended to have a greater

impact on Dunmore than any other school district in the PIAA, the following dialog occurred:

> MR. LENAHAN: It disproportionately impacts Dunmore, specifically, because
> of the factual circumstances of the 2018 and 2019 seasons.  There were other
> teams that also could have been moved up, and likely would have been moved
> up in their classification along with Dunmore, that were never given the
> chance."[6]

> THE COURT: But the rules all apply uniformly to them.  You're telling me that
> every school found itself in a different factual posture, but the rule that applied
> to them was the same, was it not: are you going to tell me it wasn't?

(Doc. 27 at 91 (Hr'g Tr. 91:3-12).)  Plaintiff's counsel did not respond to the question, but

Defendant's counsel stated that "the rule is not any different for Dunmore that it was for

every other school."  (*Id.* (Hr'g Tr. 91:15-16).)

Following this exchange, Dr. Lombardi testified at length as to how the CCF was

applied, both as to transfers and success points, and his unrefuted testimony established

that the formula was applied in the same manner to each school.  (*See, e.g.,* Doc. 27 at

100-03.)  When questioned whether the CCF provision addressing "Athletic Transfers" had

anything to do with "athletic intent," Dr. Lombardi answered that it did not.  (Doc. 27 at 96

(Hr'g Tr. 96:18-20).)  He further stated that the provision was intended

---

[6] Earlier in the PI Hearing, testimony was elicited from Mr. O'Brien that he believed the Dunmore girls' basketball team was treated differently because the success formula did not encompass two full seasons and "the teams that did really well in the first season were not treated the same as the teams that did well in the second season, because there were no games beyond a certain point."  (Doc. 27 at 71 (Hr'g Tr. 71:7-13).)  However, when asked whether he believed Dunmore was assigned success points differently than the way they were assigned to other schools, he stated that he did not know.  (*Id.* at 73 (Hr'g Tr. 73:8-20).)

to differentiate the student that transfers from school to school, it doesn't matter if they're not playing athletics.  The athletic transfer is a transfer from school A to school B that just plays athletics.  We tried to make it real simple.  The athletically motivated transfer that is in the Bylaws is not what this is addressing here, because those students, if they are determined to have an athletic motivation, they're not eligible for a year.

So, in that case, when we looked at the eligibility sheet from the previous year and saw students names there that weren't there the previous year, we sent a form to the school saying, we're looking at "x" number of athletic transfers.  Could you provide us supporting documentation for that.

(Doc. 27 at 96-97 (Hr'g Tr. 96:22-97:10).)  Dr. Lombardi then verified that Dunmore provided the PIAA with information that O.L. and E.C. transferred and were on the basketball team.  (Doc. 27 at 97 (Hr'g Tr. 97:11-16).)  Dr. Lombardi also testified that Dunmore was treated no differently than any of the fifteen schools with identified transfers under the CCF.  (Doc. 27 at 100-01 (Hr'g Tr. 100:7-101:4).)  Later in his testimony, Dr. Lombardi reiterated that it did not matter for the CCF whether the transfer was an athletically-motivated transfer.  He was asked by Defendant's counsel, "Does it matter, . . . for the classification formula, whether or not they were athletically-motivated transfers?"  (Doc. 27 at 103 (Hr'g Tr. 103:15-16).)  Dr. Lombardi answered, "Not for the intent of the competition formula."  (*Id.* (Hr'g Tr. 103:16).)  He said that he agreed with Mr. Hopkins that the two Dunmore transfers "were not athletically motivated transfers," but he clarified that they were "athletic transfers" under the CCF, "meaning that they're transfer students that are playing athletics.  That's the simplification of the phrase, athletic transfers."  (Doc. 27 at 104 (Hr'g Tr. 104:21-24).)

Regarding success points, Dr. Lombardi testified that every team that advanced in the play-offs, i.e., if they qualified for the next round of play, received success points even though the games were not played because of the Governor's shutdown.[7]  (Doc. 27 at 102-03 (Hr'g Tr. 102:2-103:2).)

> MS. STEINOUR YOUNG:  Did all teams that . . .  were going to be facing – or were going to be playing other games, but could not, because of the Governor's shutdown, did all those schools also receive a point?
>
> DR. LOMBARDI:  Every school that came into the entry round or advanced to the quarter final round received the appropriate number of points . . . .
>
> MS. STEINOUR YOUNG: Was Dunmore treated differently?
>
> DR. LOMBARDI:  They were not.

(Doc. 27 at 102-03 (Hr'g Tr. 102:19-103:1).)

The cited PI Hearing dialog with Plaintiff's counsel indicates that Plaintiff's equal protection claim appears to be based on a class-of-one theory.  To survive under the class-of-one theory, Plaintiff must allege facts showing that it has been treated differently from similarly situated school districts, that Defendant did so intentionally, and that this difference in treatment bears no rational relation to any legitimate interest.  *Phillips*, 515 F.3d at 243. When alleging the existence of similarly situated entities, a plaintiff "cannot use allegations ... that amount to nothing more than 'conclusory, boilerplate language' to show that he may

---

[7] Although not addressed in its reply brief, Plaintiff previously raised the issue of success points and does not refute testimony showing that all teams that qualified for a playoff round but did not play due to the Governor's shutdown received a success point.  (Doc. 27 at 102-03 (Hr'g Tr. 102:3-103:2).)

be entitled to relief," and "bald assertion[s] that other[s] ... were treated in a dissimilar manner" will not survive dismissal. *Young v. New Sewickley Twp.*, 160 F. App'x. 263, 266 (3d Cir. 2005) (internal citation omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (requiring more than a "wholly conclusory statement of claim" to survive motion to dismiss). Instead, plaintiffs must identify similarly situated individuals and allege "occasions or circumstances" of differential treatment. *Young*, 160 F. App'x. at 266; *see also Twombly*, 550 U.S. at 563 (requiring a plaintiff to plead a set of facts consistent with legal allegations in complaint to survive dismissal).

As the PI Hearing exchange and testimony set out above exemplifies, Plaintiff has presented no evidence or credible argument that it was treated differently from similarly situated school districts. Plaintiff has presented no evidence to refute testimony that the PIAA CCF was evenly applied to all member schools. Importantly, it is undisputed that the two students counted in the application of the CCF, O.L. and E.C., transferred to Dunmore and played basketball in the year they transferred. Thus, although Plaintiff disagrees with the PIAA's definition of "AthleticTransfer" as used in the CCF, it cannot show that O.L. and E.C. did not meet the definition applied to all transfers under the CCF. Further, even assuming *arguendo* that Plaintiff presented evidence that it was somehow treated differently, it presented absolutely no evidence to suggest that PIAA intentionally treated it differently.

In the absence of support for a class-of-one equal protection claim, the Court concludes Plaintiff has not shown that its chance of success is "significantly better than negligible," *Reilly*, 858 F.3d at 179, on its Fourteenth Amendment Equal Protection claim.

## 2.  State Law Claim

Plaintiff asserts in its reply brief that it is likely to succeed on the merits of its state law claim that PIAA acted arbitrarily and capriciously in reclassifying Dunmore girls' basketball team from 3A to 4A.  (*See* Doc. 25 at 2-6.)  Defendant responds that Plaintiff did not produce any evidence in support of this claim at the PI Hearing and its arguments concerning the transfer students do not show that the PIAA did not have a rational basis for its decisions.  (Doc. 26 at 3-4.)

When considering the likelihood of success of a claim against the PIAA, the Court must keep in mind the long-standing principle in Pennsylvania jurisprudence that the court's role in such a dispute is narrow.  In *School District of City of Harrisburg v. Pennsylvania Interscholastic Athletic Association*, 309 A.2d 353 (Pa. 1973), the Pennsylvania Supreme Court, after concluding that the activities of the PIAA constitute state action for constitutional purposes, stated that

> there are compelling reasons why judicial interference in this context would be inappropriate. The appellant has referred us to several cases outside this jurisdiction (*See, e.g., Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges and Secondary Schools, Inc.*, 139 U.S. App. D.C. 217, 432 F.2d 650 (1970), cert. denied, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970)) which purport to stand for the proposition that judicial interference in the affairs of private associations is the rule rather than the exception. Our reading of these cases indicates that such interference is appropriate only

under limited circumstances, as where the private association has deprived a member or prospective member of substantial economic or professional advantages or fundamental constitutional rights. We believe that the general rule with respect to high school athletic associations, insofar as it has been enunciated, is one of judicial non-interference unless the action complained of is fraudulent, an invasion of property or pecuniary rights, or capricious or arbitrary discrimination. State ex rel. *Ohio High School Athletic Ass'n v. Judges of Court of Common Pleas*, 173 Ohio 239, *State ex rel. Ohio High School Athletic Ass'n v. Judges of Court of Common Pleas*, 173 Ohio 239, 181 N.E.2d 261 (1962); *See, Sanders v. Louisiana High School Athletic Ass'n*, La. App., 242 So.2d 19 (1970).

Alongside the general rule of judicial non-interference in the affairs of private associations stands our unwillingness to involve this Court in controversies of questionable urgency.

*Sch. Dist. of City of Harrisburg*, 309 A.2d at 357–58.

The Pennsylvania Commonwealth Court reiterated this principle in *Revesz ex rel. Revesz v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 798 A.2d 830 (Pa. Commw. Ct. 2002):

The general rule and guiding legal principle with respect to high school athletic associations is one of judicial noninterference. . . . In recognizing the policy of noninterference with the decisions of the PIAA, this Court has stated that the remedy lies not with the courts but within the internal operating procedures of the PIAA which are controlled by the member schools. . . . A decision of the PIAA may be set aside by the trial court only if the action complained of is fraudulent, an invasion of property or pecuniary rights, or it constitutes capricious or arbitrary discrimination.

798 A.2d at 835–36.

Here, Plaintiff does not complain of a deprivation of "professional advantages or fundamental constitutional rights." 309 A.2d. at 357. Therefore, considered in the legal framework set out above, success on the merits of a state law claim would depend on

Plaintiff's ability to show that the PIAA application of its CCF was "fraudulent, an invasion of property or pecuniary rights, or capricious or arbitrary discrimination." *Id.* at 358; 798 A.2d at 836.  Plaintiff claims only that the PIAA decision was capricious or arbitrary.  (Doc. 25 at 2.)

"[A]n administrative action will be 'found to be arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which the action may be logically based.'" *Adams Cty. Interfaith Hous. Corp. v. Prevailing Wage Appeals Bd.,* 981 A.2d 352, 358 (Pa. Commw. Ct. 2009) (quoting *Lynch v. Urban Redevelopment Authority of Pittsburgh,* 496 A.2d 1331, 1335 (Pa. Commw. Ct. 1985)).  An action is not arbitrary "merely because it fails to effectuate a policy in the most effective or efficient manner, but the action must have 'some rational basis.'"  981 A.2d at 358 (quoting *Board of Public Education of School District of Pittsburgh v. Thomas,* 399 A.2d 1148, 1150 (Pa. Commw. Ct. 1979)).  After affirming the standard articulated in *Adams Cty. Interfaith Hous. Corp* and *Lynch,* the Commonwealth Court in *Cary v. Bureau of Professional and Occupational Affairs,* 153 A.3d 3d 1205 (Pa. Commw. Ct. 2017), pointed to the United States Supreme Court's summary of the concept:

> The United States Supreme Court has summarized the concept of arbitrary and capricious as follows:
>
> > The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the

> choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ....
>
> The reviewing court should not attempt itself to make up for [an agency's] deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation and internal quotation marks omitted).

*Cary*, 153 A.3d at 1210.

With its assertion that Defendant acted in a capricious and arbitrary manner, Plaintiff neither provides an analysis of the articulated standard nor an elucidation of how the standard applies to the circumstances of this case. (*See* Doc. 25 at 2-6.) Rather, Plaintiff provides conclusory statements devoid of citation to the record or relevant authority as exemplified by the following:

> PIAA has attempted to reclassify the Dunmore girls' basketball team from Class 3A to 4A based on clerical errors and an arbitrary interpretation of the athletic transfer provision of the Competition Classification Formula (hereinafter "the Formula"). PIAA arbitrarily refused to review its clerical errors in calculating Dunmore's number of athletic transfers despite doing so for other school districts, and despite its obligation to complete a thorough investigation. In interpreting and applying the Formula to Dunmore, PIAA arbitrarily disregarded the athletic transfer regulations, definitions, and provisions in its By-Laws and Constitution. PIAA's rules, regulations, and documents provide Dunmore with the right to appeal any designation of athletic transfers, but when Dunmore exercised that right it was arbitrarily dismissed and denied relief.

(Doc. 25 at 2.) Similarly, Plaintiff states that

PIAA relied on an arbitrarily overbroad definition of athletic transfer. PIAA interpreted the Formula to include all transfer students who subsequently participate in athletics, regardless of their motivation in transferring schools. This interpretation is untenable and over-inclusive, and arbitrarily contradicts PIAA's Constitution and By-Laws. On appeal, PIAA decided not to review the circumstances of either student's enrollment at Dunmore, and denied Dunmore's appeals without any basis in fact.

(Doc. 25 at 4.)

Notably, Plaintiff does not identify the "clerical errors" made by PIAA,[8] and does not identify the source of PIAA's investigatory "obligation."  Plaintiff does not acknowledge PIAA Executive Director Lombardi's testimony concerning the distinction between provisions of the By-Laws and Constitution and the totally separate CCF which was not meant to address the "athletically motivated transfer" addressed in Section VI of the By-Laws.  (Doc. 27 at 96-97 (Hr'g Tr. 96:25-97:5).)  Further, Plaintiff's assertions do not address Dr. Lombardi's testimony concerning the CCF's meaning of "transfer," the rationale for the CCF generally, and the fact that the CCF was applied to all school transfers using the same definition. (*See, e.g.,* Doc. 27 at 94, 96-97, 100-01 (Hr'g Tr. 94:2-4, 96:18-97:5, 100:5-101:4)).)

---

[8] Plaintiff's brief does not explain the source of any PIAA clerical error.  (*See* Doc. 25.)  However, at the PI Hearing, Mr. Hopkins noted that there was a clerical error on the Pennsylvania Interscholastic Athletic Association, Inc. (PIAA) Member School Athletic Transfer Waiver Request Form which he initiated, the transferring student's mother, Kimberly Conte, signed, and he sent to the principal of the high school from which the student had transferred.  (Doc. 27 at 38 (Hr'g Tr. 38:10-17); Pl.'s PI Hr'g Ex. 12.)  He identified the clerical error as follows: "there is a clerical error, because they have marked basketball being played in both 8th and 9th grade, which is not what the child has done.  She played basketball in 7th grade and not in 8th and 9th grade."  (Doc. 27 at 38 (Hr'g Tr. 14-17).)  Testimony from Mrs. Conte indicates that she completed the section of the form at issue.  (Doc. 27 at 12.)  Therefore, the "clerical error" identified by Mr. Hopkins is not attributable to PIAA.  Further, the materiality of the error is not discussed or established.

Dr. Lombardi stated that the CCF grew out of "complaints from the membership about certain schools' winning success, other schools, possible taking transfer students" and the establishment of a Competition Committee to address the concerns.  (Doc. 27 at 94 (Hr'g Tr. 94:2-7).)  He also testified that "the formula was approved and developed by the board, the executive staff, and it was in effect for all schools that played in the sports of boys and girls basketball and football, and it was handled evenly, consistently, and fairly across every school that participated in those sports."  (Doc. 27 at 105 (Hr'g Tr. 105:15-19).)

As set out in the previous section of this Memorandum Opinion, Dr. Lombardi explained that the CCF provision addressing "Athletic Transfers" had nothing to do with "athletic intent," it was applied evenly to all schools, and Dunmore had provided the information to the PIAA about O.L. and E.C.  *See supra* pp. 25-28.  Given this unrefuted testimony, Plaintiff's assertion that the definition is "arbitrarily overbroad" (Doc. 25 at 4) does not equate with a conclusion that the application of the definition in implementing the CCF supports a claim of capricious or arbitrary discrimination.

Insofar as Plaintiff attempts to import provisions in the By-Laws and Constitution into the CCF, Plaintiff does not do so with any specificity or citation (*see* Doc. 25 at 2-4), and unrefuted testimony regarding the distinct differences in the purposes and intent of the varying provisions would render such an attempt unavailing (*see, e.g.*, Doc. 27 at 97, 114-

116 (Hr'g Tr. 97:2-5, 114:20-116:1)). [9]   The fact that testimony established that both

students transferred to Dunmore and played basketball in the year they transferred, their

consideration as athletic transfers under the Competitive Classification Formula was

consistent with how that definition was interpreted by the PIAA and applied to *all* schools.

Plaintiff may not approve of the definition of "Athletic Transfer" adopted by the PIAA, but it

cannot dispute that neither O.L. nor E.C. "enter[ed] their new school [Dunmore] during the

traditional natural break (8th grand to 9th grade)" (CCF #3 – Athletic Transfer, Pl.'s PI Hrg.

Ex. 1), and that both O.L. and E.C. played basketball for the Dunmore girls' basketball team

in the first year they attended the school.

      Plaintiff's citations to cases involving the PIAA do not provide support for its

contention that its state law claim is likely to succeed on the merits.  Plaintiff cites *Dziewa*

for its conclusion that, in their motion for a preliminary injunction, the plaintiffs had

"'presented sufficient facts to prevail on their claim under state law' because of the

existence of 'several facts which lend themselves to the determination that the PIAA

decision was arbitrary.'"  (Doc. 25 at 4 (quoting 2009 WL 113419, at *6).)  Plaintiff does not

identify facts which may be relevant to the case at bar nor attempt to analogize that case to

this case in any way.  Thus, Plaintiff has not shown that the case, which involved a student

---

[9] Although Plaintiff generally states that PIAA arbitrarily disregarded definitions found in its By-Laws and Constitution (Doc. 25 at 2), it is noteworthy that Article VI of the By-Laws which addresses "Transfers, Residence, and Recruiting" provides the following general definition of "transfer": "A transfer occurs in any situation in which a student seeks eligibility to participate in interscholastic athletics at a school other than the one at which the student was enrolled or otherwise eligible."  (Pl.'s PI Hr'g Ex. 4 (By-Laws Art. VI § 1(A)).)

transfer due to parental separation and other factors and a PIAA decision which ruled the

transfer student ineligible to participate in wrestling for one year, 2009 WL 113419, at *2,

provides any support for the likelihood of its success on the merits of the state law claim at

issue here.  Rather, *Dziewa* simply stands for the unremarkable proposition that situations

exist where a state law claim of arbitrary and capricious discrimination by the PIAA satisfies

the preliminary injunction standard for likelihood of success on the merits.  Based upon the

readily distinguishable circumstances of this case, the Court does not find that *Dziewa's*

conclusion that the individual plaintiff had presented sufficient facts to prevail on their state

law claim has any bearing on the current inquiry.

Plaintiff cites *Boyle* v. *Pennsylvania Interscholastic Athletic Ass'n, Inc.*, 676 A.2d 695

(Pa. Commw. Ct. 1996), which addressed the issue of judicial intervention discussed in

*School District of the City of Harrisburg* and concluded that the PIAA action under

consideration presented "one of the rare cases in which judicial intervention is warranted."

*Id.* at 700.  The Commonwealth Court found that the PIAA's determination that the

transferring student was ineligible to play basketball was based "purely on rumors" which

was "inherently unfair but arbitrary as well."  *Id.* at 702.  Like *Dziewa*, *Boyle* clearly

addresses a situation where the PIAA found the individual transferring student was *ineligible*

to participate in his sport, stating that

>        [t]ransferring [s]tudents such as Boyle are placed in an untenable position,
> since no matter how thoroughly they establish that they transferred for a non-
> athletic purpose, PIAA may still deny them eligibility based on the arbitrary and
> unsubstantiated opinions of others when even their former principals have

found no such purpose.

676 A.2d at 702.  Like *Dziewa*, the facts of this case are distinguishable, most notably the facts that Plaintiff here is not an individual determined to be ineligible to play and the PIAA action here did not limit the transferring students' ability to play on the girls' basketball team in any way.  The Court specifically clarified "[b]ut nothing about this change from 3A to 4A operates to prevent any student from playing on the girls' basketball team, does it?"  (Doc. 27 at 82 (Hr'g Tr. 82:20-22).)  Plaintiff's counsel answered, "No, Your Honor."  (*Id.* (Hr'g Tr. 82:23).)  Therefore, the cases cited do not provide support for Plaintiff's argument that it is likely to succeed on the merits of its state law claim.

Based on the current record, the Court concludes that Plaintiff has not shown it is "significantly better than negligible," *Reilly*, 858 F.3d at 179, that it will succeed on its state law claim because Plaintiff has not shown arbitrary and capricious conduct on the part of the PIAA.  Plaintiff has not shown that the PIAA did not examine relevant data and articulate a satisfactory explanation for its action. *See Cary*, 153 A.3d at 1210.  As required, the PIAA has articulated a reasoned basis for its application of the formula, *see Adams Cty. Interfaith Hous. Corp.*, 981 A.2d at 358.  *See supra* p. 23 (quoting Doc. 27 at 87-88 (Hr'g Tr. 87:25-88:16)).  Plaintiff has not shown that the rationale provided by Defendant was not a reasoned basis for its decision to consider the two transfer students in its application of the CCF.

37

Plaintiff has not come forward with any evidence that Dunmore was treated differently from other schools with transfer students.[10]  As noted above, *see supra* p. 34, Plaintiff may not approve of the definition of "Athletic Transfer" adopted by the PIAA, but Plaintiff cannot dispute that neither O.L. nor E.C. "enter[ed] their new school [Dunmore] during the traditional natural break (8th grand to 9th grade)" (CCF #3 – Athletic Transfer, Pl.'s PI Hrg. Ex. 1), and that both O.L. and E.C. played basketball for the Dunmore girls' basketball team in the first year they attended the school.  Thus, both students fit the definition of "athletic transfer" adopted by the PIAA, and the CCF's transfer provision was not arbitrarily applied to Plaintiff's girls' basketball team.  *See supra* pp. 26-28.

---

[10]  As noted above, *see supra* n.7, Plaintiff does not address the issue of success points in its reply brief.  Nonetheless, the assignment of success points based on eligibility to play in the 2020 post-season quarter-finals does not provide a basis to find that success on the merits of Plaintiff's state law claim is likely in that unrefuted testimony showed that all teams that qualified for a playoff round but did not play due to the Governor's shutdown received a success point.  (Doc. 27 at 102-03 (Hr'g Tr. 102:3-103:2).)

Similarly, Plaintiff does not address the previously raised issue that the PIAA's modification of the athletic transfer provision of the Competition Classification Formula during the two-year cycle was arbitrary and irrational in violation of Plaintiff's due process rights (Doc. 16 at 18).  This asserted basis for relief would fail for the same reason as the others in that Plaintiff presented no evidence that it was applied arbitrarily or irrationally.  For example, when questioned on the issue by Plaintiff's counsel at the PI Hearing, Dr. Lombardi stated the following:

> the point you're missing that you're not accepting, but I've got to try to get it right for you, is we classify in a two-year window, and because we classify in a two-year window, it wouldn't matter when the board would pass [the modified athletic transfer provision] because . . . the classification of the school does not go into effect until the following year. Therefore, it doesn't matter when the transfer would take place, if it's in the two-year cycle.

(Doc. 27 at 108-09 (Hr'g Tr. 108:24-109:6).)

Though Plaintiff disagrees with PIAA's interpretation and application of the CCF, an action is not arbitrary "merely because it fails to effectuate a policy in the most effective or efficient manner," *Adams Cty. Interfaith Hous. Corp.*, 981 A.2d at 358. Whether the "Athletic Transfer" section of the CCF is a model of clarity optimally drafted and applied is not at issue. The Court is not to substitute its judgment for that of the PIAA and cannot find a decision arbitrary merely because Plaintiff or the Court may think that the effectuation of the CCF could be more effective or efficient. *Cary*, 153 A.3d at 1210, *Adams Cty. Interfaith Hous. Corp*, 981 A.2d at 358. Given that the scope of review under the arbitrary and capricious standard is narrow, the Court considers only whether the decision at issue was based on relevant factors and whether there has been a clear error of judgment. *Cary*, 153 A.3d at 1210. The Court's role is not to provide an alternative interpretation to an even-handedly applied and properly adopted rule. Having conducted the appropriate review, the Court finds that, since Defendant presented a rational connection between the facts found and the choice made in the application of the CCF to Dunmore High School girls' basketball team and *all teams* (Doc. 26 at 3-4; Doc. 27 at 94, 96-97, 100-01, 104, 105), Plaintiff has not, on the current record, shown that the PIAA application of the formula was arbitrary and capricious.

While Plaintiff asserts that this is a case where, unlike *School District of City of Harrisburg*, judicial intervention is necessary to remedy the harm caused by the PIAA's capricious and arbitrary discrimination (Doc. 25 at 5-6), mere conclusory statements do not

establish a cognizable distinction.  Plaintiff's disagreement with the PIAA's interpretation of the CCF does not present an exception to the "general rule and guiding legal principle with respect to high school athletic associations . . . of judicial noninterference," *Revesz*, 798 A.3d at 835, in the face of unrefuted evidence that the interpretation was consistently applied to all schools.  Further, the record shows that the PIAA has a process for addressing concerns related to the CCF which involves an opportunity for member schools to raise concerns and to have a say in the proposed changes in the CCF.  (*See, e.g.*, Doc. 27 at 98 (Hr'g Tr. 98:1-21).)  Thus, this is likely a case where the remedy for Plaintiff's grievances "lies not with the courts but within the internal operating procedures of the PIAA which are controlled by the member schools."  *Revesz*, 798 A.2d at 835.

For the foregoing reasons, the Court concludes that success on the merits of Plaintiff's state law claim is unlikely under any standard because Plaintiff has not shown that its chance of success is "significantly better than negligible," *Reilly*, 858 F.3d at 179, on its state law claim.  With this determination, Plaintiff has failed to satisfy the first gateway element of the required preliminary injunction showing in that Plaintiff has not shown that its chance of success is "significantly better than negligible," *Reilly*, 858 F.3d at 179, on any claimed basis for entitlement to relief.

## B.  <u>Irreparable Harm</u>

In its brief in support of the pending Motion, Plaintiff asserts that

Dunmore will suffer irreparable harm in the absence of preliminary relief because PIAA has deprived Dunmore of its constitutional rights such that

monetary damages would not adequately address the resulting harm, as detailed herein below. Dunmore's failure to get the requested relief will cause Dunmore students to lose the opportunity to participate in the girls' basketball program and will deprive Dunmore students of the chance to represent their school in state championships at the appropriate competitive level, which cannot be measured by money.

(Doc. 16 at 12.)

In order to prove irreparable harm, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal citation and quotation marks omitted). *Acierno* reiterated the standard set out in *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351 (3d Cir.1980):

> [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury...."

40 F.3d at 655 (citing 614 F.2d at 358 (quoting *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir.1976) and *Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir.1969)); *see also Campbell Soup Co. v. Conagra, Inc.,* 977 F.2d 86, 91–92 (3d Cir.1992) (establishing some remote risk of irreparable harm not enough)). *Reilly* more recently articulated the second gateway factor to require a showing that the plaintiff "is more likely than not to suffer irreparable harm in the absence of preliminary relief." 858 at 179.

A Western District of Pennsylvania case decided in October of this year summarized cases in the Commonwealth, both federal and state, where the plaintiff sought a preliminary

injunction against the PIAA and, in each case, the court concluded that ineligibility to play a

sport did not constitute irreparable harm.

> [A] student is not "irreparably harmed," for purposes of injunctive relief, by his
> or her inability to compete in interscholastic high school sports, even when the
> student is barred from competition for an entire season. *See, e.g., Dziewa v.
> Pennsylvania Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 08-5792, 2009 WL
> 113419, at *7 (E.D. Pa. Jan. 16, 2009) ("This Court, as well as all other federal
> courts, have previously and consistently held that ineligibility for participation in
> interscholastic       athletic       competitions       alone       does       not
> constitute irreparable harm."); *Cruz v. Pennsylvania Interscholastic Athletic
> Ass'n,   Inc.*,   2000   WL   1781933,   *1   (E.D.   Pa.   Nov.   20,   2000)
> (no irreparable harm where student was "limited in his participation in high
> school athletics rather than barred from it entirely" and could still practice with
> his team, dress in uniform and attend competitions); *Sahene v. Pennsylvania
> Interscholastic Athletic Ass'n*, No. 99-902, at 5-6 (W.D. Pa. July 19, 1999)
> (plaintiff would not suffer irreparable harm if precluded from competing in
> interscholastic football for an entire season where he could practice with his
> team, coach others, or participate in intermural sports and non-school related
> athletic events); *Revesz ex rel. Revesz v. Pennsylvania Interscholastic Athletic
> Ass'n, Inc.*, 798 A.2d 830, 836 (Pa. Commw. Ct. 2002) ("The fact that a student
> is determined ineligible to play interscholastic sports for one year does not
> necessarily translate into a loss of opportunity to attain college scholarships.")
> (citing *Adamek v. Pennsylvania Interscholastic Athletic Association*, 57 Pa.
> Cmwlth. Ct. 261, 426 A.2d 1206 (1981)).

*A.M. by & through McKalip v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, Civ. A. No.

1:20-CV-290-SPB, 2020 WL 5877617, at *4 (W.D. Pa. Oct. 1, 2020).

In *St. Patrick High School v. New Jersey Interscholastic Athletic Association*, Civ. A.

No. 10-CV-948, 2010 WL 715826 (D.N.J. Mar. 1, 2010), the plaintiff sought a preliminary

injunction against the defendant '("NJIAA"), after the NJIAA barred St. Patrick from

competing in the state basketball tournament after it determined that the team had violated

league practice rules.  *Id.* at *1.  The plaintiff argued that that it would suffer irreparable

harm because

> the players are being denied an "irreplaceable opportunity: the chance to participate in the 2010 New Jersey state high school basketball tournament as part of a team that is ranked number one in the state and in the top ten in the nation" and the opportunity "to compete on a huge stage before an audience that will include many college coaches, scouts and recruiters; as a consequence, they will miss an irreplaceable opportunity to gain college scholarships."

*Id.* at *5 (quoting Pl.'s Br.).  The court rejected the argument, stating that it recognized "the

significance of these opportunities, [but] they do not rise to the type of harm injunctive relief

is intended to remedy."  *Id.* (citing *Dziewa*, 2009 WL 113419, at *7 (finding potential college

admissions and scholarship opportunities "are speculative, and not the kind of harm that

preliminary injunctions were fashioned to address.")).   The court also noted that the

plaintiff's "basketball team has had the opportunity to participate in a full regular season, a

county tournament, out-of-state play on a number of occasions, and in any other non-

NJSIAA events.  In light of these considerations, this Court cannot find that Plaintiff is

facing irreparable harm."  2010 WL 715826, at *5.

   Here, Plaintiff was asked at the PI Hearing about how the harm identified in its brief,

i.e., "failure to get the requested relief will cause Dunmore students to lose the opportunity

to participate in the girls' basketball program and will deprive Dunmore students of the

chance to represent their school in state championships at the appropriate competitive level,

which cannot be measured by money" (Doc. 16 at 12) squared with the statement in *Revesz*

that "the loss of an opportunity to play in interscholastic athletics for one year does not constitute irreparable harm."   (Doc. 27 at 79-80 (Hr'g Tr. 79:17-80:8).)   Plaintiff's counsel pointed to the fact that *Revesz* addressed a single plaintiff and here the case is about "an entire school district, an entire team, and the determination by the PIAA of an enrollment classification."  (Doc. 27 at 80 (Hr'g Tr. 80:19-24).)

Plaintiff has presented no caselaw or argument that supports a conclusion contrary to those cases cited above which have consistently held that inability to play in a game or for a season presents harm that is either too speculative or not the type that a preliminary injunction is meant to address.  Here the Dunmore girls' basketball team is not precluded from play in any game during the regular season or post-season competition, it merely will compete at a different level in post-season play.  Thus, the Court concludes that, more than any case cited, Plaintiff does no more than suggest "a remote or speculative possibility of future harm," *Dziewa*, 2009 WL 113419, at *7 (citing *Acierno*, 40 F.3d at 655).

Having determined that success on the merits is unlikely because Plaintiff has not shown that its chance of success is "significantly better than negligible" that it will prevail on any of its state or federal claims and Plaintiff has not shown that is "more likely than not to suffer irreparable harm in the absence of preliminary relief," Plaintiff has not satisfied the "gateway factors" identified in *Reilly,* 858 F.3d at 179.  Therefore, the Court will not consider the remaining two factors necessary to prevail on a motion for a preliminary injunction.  *Id.*

## V. CONCLUSION

For the reasons discussed above, the Court will deny Plaintiff's Motion for

Preliminary Injunction (Doc. 15).  A separate Order is filed simultaneously with this

Memorandum Opinion.

Robert D. Mariani
United States District Judge